**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **(1) MARIELLE TREY SMITH,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **-vs-** | ) | Case: CIV-22-1059-D |
| | ) | |
| **(1) STEVEN HARPE, DIRECTOR** | ) | |
| **Okla. Dept. of Corr.** | ) | |
| **Respondent.** | ) | |

---

# PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. §2254 AND BRIEF IN SUPPORT

---

**Submitted by,**

**DEBRA K. HAMPTON, OBA # 13621**
Hampton Law Office, PLLC
3126 S. Blvd., # 304
Edmond, OK 73013
Tel: (405) 250-0966
Fax: (866) 251-4898
Email: hamptonlaw@cox.net
Attorney for Petitioner

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iv

CASES .......... iv

STATUTES .......... viii

UNITED STATES CODE .......... viii

RULES .......... viii

CONSTITUTIONAL PROVISIONS .......... ix

OKLAHOMA UNIFORM JURY INSTRUCTIONS .......... ix

I. JURISDICTION .......... 1

II. PRIOR PROCEEDINGS .......... 1

III. TIMELINESS OF PETITION .......... 3

IV. EXHAUSTION OF CLAIMS .......... 4

V. STANDARD OF REVIEW .......... 4

VI. STATEMENT OF THE FACTS .......... 6

VII. GROUNDS .......... 11

I. INTRODUCTION OF INADMISSIBLE HEARSAY REGARDING ALLEGED STATEMENTS FROM PETITIONER'S NON-TESTIFYING, CO- DEFENDANT ACCOMPLICE, MELISHA TORRES, THROUGH THIRD PARTY LAW ENFORCEMENT WITNESSES VIOLATED HIS CONSTITUTIONAL RIGHTS TO A FAIRTRIAL, DUE PROCESSOF LAW, AND CONFRONTATION. .......... 11

II. THE STATE'S EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE ALL THE ELEMENTS OF ROBBERY WITH A DANGEROUS WEAPON AND, THEREFORE, ALSO INSUFFICIENT TO SUPPORT PETITIONER'S CONVICTION FOR FIRST DEGREE FELONY MURDER BASED ON THAT UNDERLYING FELONY. .......... 19

III. THE INTRODUCTION OF THE STATE'S PROBABLE CAUSE AFFIDAVITS SUBMITTED IN SUPPORT OF ITS WARRANTS TO SEARCH THE VEHICLE OF PETITIONER'S MOTHER CONTAINED IRRELEVANT AND PREJUDICIAL HEARSAY IN VIOLATION OF PETITIONER'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL, DUE PROCESS OF LAW, AND CONFRONTATION. .................................. 24

IV. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PERMITTING DETECTIVE EARLS TO GIVE IRRELEVANT AND IMPROPER OPINION TESTIMONY IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS OF LAW. ................................. 29

V. PETITIONER WAS DENIED HIS RIGHT TO A FAIR TRIAL BECAUSE THE COURT DID NOT IDENTIFY RYAN FIELDS AS AN ACCOMPLICE OR INSTRUCT THE JURY, SHE WAS AN ACCOMPLICE AS A MATIER OF LAW. ..................................................... 31

VI. THE STATE'S MISCONDUCT DENIED PETITIONER OF A FAIR TRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ......................................................................... 34

VII. PETITIONER WAS DENIED A FAIR TRIAL BEFORE AN UNBIASED JURY BY THE SEATING OF LONGTIME, FORMER ALTUS POLICE OFFICER JUROR S.M. ...................................................... 40

VIII. PETITIONER WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ................. 42

CONCLUSION ........................................................................................................ 48

## TABLE OF AUTHORITIES

### CASES

*Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891) .......... 30

*Alverson v. Workman*, 595 F.3d 1142, 1155 (10th Cir. 2010) .......... 5

*Atterberry v. State*, 1986 OK CR 186, ¶ 8, 731 P.2d 420, 422 .......... 33

*Berger v. United States*, 295 U.S. 78, 88 (1935) .......... 37

*Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006) .......... 12

*Bourjaily v United States*, 483 U.S. 171 (1987) .......... 16

*Brady v. Maryland*, 373 U.S. 83 (1963) .......... 40

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) .......... 13

*Brown v. Wainwright*, 785 F.2d 1457, 1463-64 (11th Cir. 1986) .......... 40

*Bryson v. State*,1994 OK CR 32, 39, 76 P.2d 240, 256 .......... 33

*Chapman v. California*, 386 U.S. 18 (1967) .......... 13, 26, 28

*Collis v. State*, 1984 OK CR 80, ¶¶ 9-12, 685 P.2d 975, 977 .......... 45

*Crawford v. Washington*, 541 U.S. 36 (2004) .......... 13, 19, 28

*Cummings v. State*, 1998 OK CR 45, ¶ 19, 968 P.2d 821, 830 .......... 34

*Darden v. Wainwright*,477 U.S. 168, 181 (1986) .......... 32, 42

*Darr v. Burford*, 339 U.S. 200, 203 (1950) .......... 4

*Davis v. Burke*, 179 U.S. 399, 401-403 (1900) .......... 4

*Davis v. State*, 1990 OK CR 20, ¶ 8, 792 P.2d 76, 83 .......... 33

*Davis v. Washington*, 547 U.S. 813, 822 (2006) .......... 28

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) .......... 40, 42

*Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009) .......... 12, 13

*Dutton v. Evans*, 400 U.S. 74, 89 (1970) .......... 19

*Early v. Packer*, 537 U.S. 3, 8, (2002) .................................................................... 4

*Enriquez v. State,* 1987 OK CR 164, ¶ 8, 740 P.2d 1204, 1205-1206 ............................. 43

*Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963)............................................................ 13

*Fields v. State*, 1983 OK CR 106,1113, 666 P.2d 1301, 1304 ........................................ 20

*Fiswick v. United States*, 329 U.S. 211, 217 (1946)......................................................... 19

*Frederick v. State*, 2017 OK CR 12, 400 P.3d 786 ........................................................ 28

*Gabus v. Harvey*, 1984 OK CR 4, ¶ 10-16, 678 P .2d 253, 255...................................... 32

*Giglio v. United States*, 405 U.S. 150, 153 (1972).......................................................... 40

*Hamilton v. Mullin*, 436 F.3d 1181, 1186 (10th Cir. 2006) ............................................... 5

*Harrington v. Richter*, 562 U.S. 86, 105 (2011)......................................................... 5, 44

*Harris v. State*, 2007 OK CR 28, ¶ 25, 164 P.3d 1103, 1107-08 .................................... 34

*Hemphill v. New York*, 142 S.Ct. 681, 684 (2022) .......................................................... 13

*Hill v. State*, 1943 OK CR 55, 137 P.2d 261, 268........................................................... 30

*Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005) ....................................................... 36

*Hogan v. State*, 2006 OK CR 19, 138, 139 P.3d 907, 923 ............................................... 34

*Hogan v. State*,2006 OK CR 19, ¶ 38, 139 P.3d 907, 923 ............................................... 33

*Humphries v. State*, 1997 OK CR 59, ¶ 25, 947 P.2d 565, 575 ....................................... 27

*In re Winship*, 397 U.S. 358 (1970)................................................................................. 20

*Irvin v. Dowd*, 366 U.S. 717, 721-722 (1961) ................................................................. 42

*Jackson v. Denno*, 378 U.S. 368, 387 (1964) .................................................................. 30

*Jackson v. Virginia*, 443 U.S. 307 (1979) .............................................................. 5, 20, 24

*Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009)............................................................ 3

*Johnson v. State*, 2004 OK CR 23, ¶ 10, 93 P.3d 41, 44-45 ........................................... 20

*Jones v. State*, 1987 OK CR 103, ¶ 16, 738 P.2d 525, 527 ............................................. 17

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ........ 44

*Locke v. Saffle*, 237 F.3d 1269, 1273 (10th Cir. 2001) ........ 3

*Malone v. State*, 2013 OK CR 1, ¶ 40, 293 P.2d 198, 211 ........ 35

*Maryland v. Craig*, 497 U.S. 836, 845 (1990) ........ 28

*Matthews v. State*, 2002 OK CR 16, ¶ 16, 45 P.3d 907, 915 ........ 42

*Mauox v. United States*, 156 U.S. 237, 242-43 (1895) ........ 18

*McCarty v. State*, 1988 OK CR 271,117,765 P.2d 1215, 1218 ........ 31

*Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000) ........ 5

*Michel v. Louisiana*, 350 U.S. 91, 101 (1955) ........ 46

*Michigan v. Bryant*, 562 U.S. 344, 359 (2011) ........ 28

*Miller v. Pate*, 386 U.S. 1, 7 (1967) ........ 40

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ........ 5

*Mitchell v. Gibson,* 262 F.3d 1036, 1045 (10th Cir. 2001) ........ 12

*Moore v. State*, 1990 OK CR 5, ¶ 49, 788 P.2d 387, 399 ........ 31

*Napue v. Illinois*, 360 U.S. 264, 269 (1959) ........ 40

*Nunley v. State*, 1979 OK CR 107, ¶ 10, 601 P.2d 459, 462-463 ........ 33

*O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) ........ 13

*Ohio v. Roberts*, 448 U.S. 56, 66 (1980) ........ 19

*Omalza v. State*, 1995 OK CR 80, 13,911 P.2d 286, 295-96 ........ 16, 29

*Paine v Massie*, 339 F.3d 1194, 1201-04 (10th Cir.2003) ........ 49

*Parker v. Gladden*, 385 U.S. 363, 366 (1966) ........ 43

*Paxton v. Ward*, 199 F.3d 1197, 1216-18 (10th Cir. 1999) ........ 40

*Picard v. Connor*, 404 U.S. 270, 278 (1971) ........ 4

*Pointer v. Texas,* 380 U.S. 400, 404-08 (1965) ........ 28

*Pullen v. State*, 2016 OK CR 18, ¶ 11, 387 P.3d 922, 927 .......... 27

*Rojem v. State*, 2006 OK CR 7, 132, 130 P.3d 287, 295 .......... 42

*Romanov. State*, 1995 OK CR 74, ¶ 40, 909 P.2d 92, 113 .......... 17, 26, 31

*Salazar v. State*, 1998 OK CR 70, ¶ 22, 973 P.2d 315, 324 .......... 27

*Simpson v. Slate*, 1994 OK CR 40, ¶ 12,876 P.2d 690, 698 .......... 34

*Simpson v. State*, 1994OK CR40, ¶ 10-11, 16, 876 P.2d 690, 694-95 .......... 32

*Stermer v. Warren,* 360 F. Supp. 3d 639 (E.D. Mich. 2018)
*aff'd* 959 F. 3d 704 (6th 2020) .......... 5

*Stermer v. Warren*, 959 F.3d 704 (6th Cir. 2020) .......... 32, 46

*Strickland v. Washington*, 466 U.S. 668, 686 (1984) .......... passim

*U.S. v Alonzo*, 991 F.2d 1422, (8th Cir. 1993) .......... 16

*U.S. v. Bagley*, 473 U.S. 667, 676 (1985) .......... 40

*U.S. v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973),
*cert. denied*, 416 U.S. 959 (1974) .......... 30

*U.S. v. Jameson*, 478 F.3d 1204, 1208 (10th Cir. 2007) .......... 20

*U.S. v. Little*, 829 F.3d 1177 (10th Cir.2015) .......... 20

*U.S. v. Riley,* 657 F.2d 1377, 1381-85 (8th Cir. 1981) .......... 19

*U.S. v. Scheffer*, 523 U.S. 303, 313 (1998) .......... 30

*U.S. v. Stipe*, 653 F.2d 446 (10th Cir. 1981) .......... 16

*U.S. v Taylor*, 802 F.2d 1108, 1117, 1233 (9th Cir 1986) .......... 16

*United States ex rel. Kemp v. Pate*, 359 F.2d 749, 751 (7th Cir. 1966) .......... 4

*U.S. v. Young*, 470 U.S. 1, 18-19 (1985) .......... 36

*U.S. v. Zimmerman*, 943 F.2d 1204, 1214 (10th Cir. 1991) .......... 35

*Wade v. State*, 1978 OK CR 77, ¶ 3,581 P.2d 914, 916 .......... 21

*Wainwright v. Witt*, 469 U.S.412,424 (1985) .......... 42

*Wall v. State*, 1988 OK CR 125, ¶ 6, 763 P.2d 103, 105-106 .......... 27

*Warner v. State*, 2001 OK CR 11, ¶ 16, 29 P.3d at 572 .......... 42

*Welch v. State*, I998 OK CR 54, ¶¶ 6·7, 968 P.2d 1231, 1240 .......... 17

*White v. Illinois,* 502 U.S. 346, 353 (1992) .......... 19

*Wiggins v. Smith*, 539 U.S.510, 534 (2003) .......... 49

*Williams v. State*, 2001 OK CR 9, ¶ 39, 22 P.3d 702, 712-1 .......... 33

*Williams v. Taylor*, 529 U.S. 362, 412 (2000) .......... 4, 12

*Williamson v. State,* 2018 OK CR 15, 422 P.3d 752 .......... 28

*Wong Sun v. United States*, 371 U.S. 471, 490 (1963). .......... 19

**STATUTES**

12 O.S.2011, § 2402 .......... 29

12 O.S.2011 § 2403 .......... 27, 32

12 O.S.2011 § 2704 .......... 30

12 O.S.2011 § 2801 (A)(3) .......... 27

12 O.S.2011 § 2801 (B)(2)(e) .......... 14, 15

12 O.S.2011, § 2803 (8)(a) .......... 27

21 O.S.2001 § 172 .......... 33

38 O.S.2011, § 659 .......... 42

**UNITED STATES CODE**

28 U.S.C. § 2254 .......... 4, 12, 44, 50

**RULES**

Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals* .......... 45

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VI ........ passim

U.S. Const. amends XIV ........ passim

## OKLAHOMA UNIFORM JURY INSTRUCTIONS

OUJI-CR (2d) No. 4-65 ........ 21

OUJI-CR (2d) No. 4-64 ........

OUJI-CR (2d) No. 4-144, OUJI-CR (2d) ........ 21

OUJI-CR (2d) No. 9-29 ........ 33

OUJI-CR (2d) No. 9-30 ........ 33

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1) MARIELLE TREY SMITH,** | ) |
| **Petitioner,** | ) |
| | ) |
| **-vs-** | ) |
| | ) |
| **(1) STEVEN HARPE, DIRECTOR** | ) |
| **Okla. Dept. of Corr.** | ) |
| **Respondent.** | ) |

**PETITION FOR WRIT OF HABEAS CORPUS AND BRIEF IN SUPPORT BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. §2254**

COMES NOW, the Petitioner, **MARIELLE TREY SMITH**, # 640152, through his attorney, Debra K. Hampton, in custody of the Oklahoma Department of Corrections, incarcerated at the Davis Correctional Facility, Holdenville, Oklahoma. Petitioner states:

## I. JURISDICTION

The action does not involve diversity jurisdiction.

## II. PRIOR PROCEEDINGS

### a. ORIGINAL CONVICTION

| | |
|---|---|
| **Court:** | Jackson County |
| **Case Number:** | CF-2017-184 |
| **Date of sentence:** | March 6, 2019 |
| **Presiding Judge:** | Clark E. Huey |

**Offenses** and **Terms of Sentence:**

Count 1: Felony Murder (Robbery with/Dangerous Weapon), 21 O.S.2012, § 701.7(B)
Count 2: Unlawful Removal of a Dead Body, 21 O.S.2011, § 1161

**Trial:** Petitioner was convicted by a jury. The facts are set forth below.
**Counsel:** John Jensen.

**b. DIRECT APPEAL**

**Court:** Oklahoma Court of Criminal Appeals (OCCA)
**Case No:** F-2019-195
**Date filed:** September 16, 2021
**Opinion:** Unpublished
**Counsel:** Kristi Christopher, OIDS

**PROPOSITIONS ON APPEAL:**

I. INTRODUCTION OF INADMISSIBLE HEARSAY REGARDING ALLEGED STATEMENTS FROM PETITIONER"S NON-TESTIFYING, CO-DEFENDANT/ACCOMPLICE, MELISHA TORRES, THROUGH THIRD PARTY LAW ENFORCEMENT WITNESSES VIOLATED HIS CONSTITUTIONAL RIGHTS TO A FAIRTRIAL, DUE PROCESSOF LAW, AND CONFRONTATION.

II. THE STATE'S EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE ALL THE ELEMENTS OF ROBBERY WITH A DANGEROUS WEAPON AND, THEREFORE, ALSO INSUFFLCIENT TO SUPPORT PETITIONER'S CONVICTION FOR FIRST DEGREE FELONY MURDER BASED ON THAT UNDERLYING FELONY.

III. THE INTRODUCTION OF THE STATE'S PROBABLE CAUSE AFFIDAVITS SUBMITTED IN SUPPORT OF ITS WARRANTS TO SEARCH THE VEHICLE OF PETITIONER'S MOTHER CONTAINED IRRELEVANT AND PREJUDICIAL HEARSAY IN VIOLATION OF PETITIONER'SCONSTITUTIONAL RIGHTS TO A FAIRTRIAL, DUE PROCESS OF LAW, AND CONFRONTATION.

IV. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PERMITTING DETECTIVE EARLS TO GIVE IRRELEVANT AND IMPROPER OPINION TESTIMONY IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS OF LAW.

V. PETITIONER WAS DENIED HIS RIGHT TO A FAIRTRIAL BECAUSE THE COURT DID NOT IDENTIFY RYAN FIELDS AS AN ACCOMPLICE OR INSTRUCT THE JURY, SHE WAS AN ACCOMPLICE AS A MATIER OF LAW.

VI. THE STATE'S MISCONDUCT DENIED PETITIONER OF A FAIRTRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

VII. THE TRIAL COURT'S EXCLUSION OF PROSPECTIVE JUROR, C.G., BECAUSE SHE COULD NOT CLIMB THE STEEP, NARROW STAIRCASE FROM THE COURTROOM TO THE JURY DELIBERATLON ROOM VIOLATED THE SPIRIT OF THE AMERICANS WITH DISABILITIES ACT AND PETITIONER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

VIII. PETITIONER WAS DENIED A FAIRTRIAL BEFORE AN UNBIASED JURY BY THE SEATING OF LONGTIME, FORMER ALTUS POLICE OFFICER, JUROR S.M.

IX. PETITIONER WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

X. THE CUMULATIVE EFFECT OF ALL THE ERRORS ADDRESSED ABOVE DEPRIVED PETITIONER OF A FAIR TRIAL.

## III. TIMELINESS OF PETITION

The Petitioner asserts this Petition is timely under 28 U.S.C. § 2244(d) the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Petitioner's Direct Appeal was affirmed on September 16, 2021, the AEDPA did not run until, December 15, 2021, (90) days expiration in which to file a petition for Writ of Certiorari in the United States Supreme Court. *Locke v. Saffle*, 237 F.3d 1269, 1273 (10th Cir. 2001); *Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009). The Petition is timely.

## IV. EXHAUSTION OF CLAIMS

The Petitioner's claims in this Petition are exhausted as the state court has had the first opportunity to hear the claim sought to be vindicated in this Federal Habeas proceeding. The Federal Court has required a state prisoner to present the state courts with the same claim he urges upon the Federal Courts. See *Darr v. Burford*, 339 U.S. 200, 203 (1950); *Davis v. Burke*, 179 U.S. 399, 401-403 (1900). Sometimes, "the ultimate question for disposition," *United States ex rel. Kemp v. Pate*, 359 F.2d 749, 751 (7th Cir. 1966), "***will be the same despite variations in the legal theory or factual allegations urged in its support***." *Picard v. Connor*, 404 U.S. 270, 278 (1971).

## V. STANDARD OF REVIEW

Federal habeas relief may not be granted for claims subject to 28 U.S.C. § 2254(d) unless it is shown that the state court's decision "was contrary to" federal law then clearly established by the Supreme Court, or it "involved an unreasonable application of" such law, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). Petitioner argues that analyzing the OCCA's decision demonstrates that the decision is ***"contrary to"*** clearly established precedents as the State Court **"*applies a rule that contradicts the governing law set forth in our cases*** and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, *supra*, at 405-406; (quoting *Early v. Packer*, 537 U.S. 3, 8, (2002)). The Court held that avoiding these "pitfalls ***does not*** require citation of our cases — indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state court decision contradicts them." *Id.*

"Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-103 (2011) (citing *Jackson v. Virginia*, 447 U.S. 307, 332 n.5 (1979)).

Even under the AEDPA's deferential standard, a federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Hamilton v. Mullin*, 436 F.3d 1181, 1186 (10th Cir. 2006). "If a state court's finding rests on thin air, the petition will have little difficulty satisfying the standards for relief under § 2254." *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000)[1]. The OCCA's determination under a timely AEDPA analysis involves an objectively unreasonable determination of Supreme Court precedents because the State Court's determination rests partly on thin air. This Court should conclude the Writ should issue. The Tenth Circuit has held that under 28 U.S.C. § 2254, review is "limited to examining whether the highest state court's resolution of a particular claim is contrary to, or an unreasonable application of, clearly established federal law." *Alverson v. Workman*, 595 F.3d 1142, 1155 (10th Cir. 2010) "Supreme Court precedent directs us, in deciding how to resolve a federal claim raised by a state habeas petitioner, to focus on the last state court decision disposing of that federal claim." *Alverson* at 1152.

---

[1] *See also Stermer v. Warren,* 360 F. Supp. 3d 639 (E.D. Mich. 2018*) aff'd* 959 F. 3d 704 (6th 2020) the undersigned appearing on behalf of Linda Stermer.

## VI. STATEMENT OF THE FACTS

On August 21, 20I7, Melisha Torres (Ms. Torres), a known drug dealer who was enrolled in Jackson County Drug Court to avoid a prison sentence, entered the Altus Police station to report she believed someone had been shot and killed in her home at 408 North Julian Street the night before. (Tr. III 165). Ms. Torres identified Jared Holmes as the person who was shot and Marielle Smith as the shooter. (Tr. III 170). Ms. Torres told police that approximately one month earlier, Mr. Holmes, who was also a drug dealer, asked her if she knew anyone who would sell him a large quantity of marijuana so he could resell it in smaller quantities. Ms. Torres provided Mr. Holmes with Petitioner's name. (Tr. II 119).

Police obtained records from Ms. Torres's cell phone provider showing several calls between Ms. Torres's cell phone and a phone number in her contacts listed as "Toon," which is Petitioner's nickname. The calls began on August 20, 2017, at 7:02 p.m. and ended at 12:04 p.m. on August 21, 2017. (State's Exhibit 3; Tr. II 142). There were also four text messages. The first message, at 7:35 p.m., was from Petitioner's phone requesting that Ms. Torres answer her phone. Ms. Torres replied at 7:36 and 7:37 p.m. apologizing for not answering and explaining she had music up too loud to hear the phone ring and that she was on her way back "from the city." The fourth text, at 11:00 p.m. from Ms. Torres to Petitioner's phone, asked him to call her. (Tr. II 165-67).

After her August 21, 2017, police interview, Ms. Torres consented to a search of her home. (State's Exhibit I). Police did not locate a body but observed a broken window and a shell casing. (Tr. II 179, 183-84, 186, 188; Tr. Ill 175). On August 22, 2017, a farmer discovered Mr. Holmes's body floating in a creek in rural Tillman County, near Frederick.

(Tr. II 211, 215). The Medical Examiner ruled Mr. Holmes's cause of death was multiple gunshot wounds. (Tr. IV 92).

After locating Petitioner's mother's 2007 white Dodge Charger, the Altus Police Department obtained a warrant for the vehicle's GPS information. (Tr. III I52-54, 175). A printout of the GPS data admitted at trial as State's Exhibit 13, detailed the Charger's movements on August 20-21, 2017. According to the printout, the Charger left Lawton en route to Altus on August 20, 2017, at 6:45 p.m. (Tr. III 212). The Charger parked in the 400 block of North Julian in Altus from 7:20 p.m. to 8:21 p.m. and then returned several minutes later and parked for an additional seven minutes before traveling back towards Lawton on Highway 62. (Tr. III 214). Next, the Charger stopped at a Lawton Walmart for 28 minutes, where Petitioner is seen on Walmart's surveillance footage entering the store and shopping for cleaning supplies and other items. (Tr. III 215-16, 224-30; State's Exhibits I0, 18). After leaving Walmart, the Charger stopped in the 5300 block of Northwest Euclid, where Mr. Holmes's Tahoe was eventually discovered, and in the 500 block of West Gore, where Petitioner's friend Marquis Johnson lived in the Invitational Apartments, before returning to Altus. (Tr. III 217-19). The Charger returned to the 400 block of North Julian at 11:37 p.m., where it remained until 12:29 a.m. on August 21, 2017. (Tr. 111220). Next, at 1:09 a.m., the Charger stopped briefly on County Road East 1800 in Tillman County, where Mr. Holmes's body was recovered the following day. (Tr. III 221). Finally, the Charger stopped in the 200 block of South 3rd Street in Frederick, near Petitioner's deceased grandmother's house, for an hour and eighteen minutes, before returning to Lawton. (Tr. III 221-23, 257).

Petitioner and his companion, Ryan Fields, were arrested in Oklahoma City, without incident, by the United States Marshal's Office on September 7, 2017. (Tr. IV 124, 128). The Marshal's Office recovered ten firearms, including a .10 mm Glock handgun, during the arrest. (Tr. IV 126). Howard Kong, a firearm and toolmark examiner employed by the Bureau of Alcohol, Tobacco, and Firearms, compared the casing found in Ms. Torres's home to the .10 mm Glock handgun recovered during Petitioner's arrest. (Tr. V 5). Examiner Kong determined the casing found in Mr. Torres's home was fired from the Glock recovered during Petitioner's arrest. (Tr. V 13; State's Exhibit 40). Petitioner, who was high on PCP when he was arrested, consented to interviews with law enforcement shortly after his arrest on September 8, 2017, and again on September 11, 2017. (Tr. IV 129; Tr. V 79, 84, 92). Altus Police Detective Colby Earls testified that Petitioner readily admitted that he shot and killed Mr. Holmes, but said he did so in self-defense after Mr. Holmes attempted to rob him at gunpoint. (Tr. V 79, 90).

Altus police officers also interviewed Ryan Fields on September 11, 2017, and she provided a version of events largely consistent with what Petitioner had told them. Ms. Fields initially informed police that Mr. Holmes had a gun, and Petitioner shot Mr. Holmes in self-defense after believing Ms. Torres and Mr. Holmes had set Petitioner up to be robbed. (Tr. III 68, 89; Tr. V 102, 104). However, over a year later and after the District Attorney's Office offered to reduce her first-degree murder charge to accessory and recommend a fifteen year or less sentence, Ms. Fields changed her story. (Tr. III 50). Ms. Fields testified that her deal with the State was contingent on her testimony at Petitioner's trial. (Tr. III. 118).

During Petitioner's trial, Ms. Fields testified that she drove Petitioner, who was high on PCP, from Lawton to Ms. Torres's house in Altus, where she assumed there would be a marijuana drug deal. (Tr. III. 9). When they arrived in Altus, Ms. Torres was not there. Ms. Torres told Petitioner during a phone conversation, which Ms. Fields overheard on Bluetooth, that she was in Oklahoma City. Petitioner was angry at Ms. Torres because she was supposed to be at her home in Altus. Ms. Fields heard Petitioner tell Ms. Torres "You were supposed to be at the house. You know I need this money." (Tr. III 11). Ms. Torres eventually suggested that Petitioner break a window to gain entry to her house to wait for her to arrive home. (Tr. III 12). Ms. Fields broke a bathroom window, climbed inside, and let Petitioner in through the front door. (Tr. III 13). Approximately fifteen minutes after Ms. Fields and Petitioner entered the home, Mr. Holmes knocked on the door. When Mr. Holmes entered, Petitioner asked Mr. Holmes if he wanted to smoke a blunt. Mr. Holmes declined. (Tr. III 14).

Next, Ms. Fields testified that Petitioner pulled a gun on Mr. Holmes and ordered him to take off his pants and lie face down on the floor. Ms. Fields testified Petitioner was angry because Ms. Torres had told him Mr. Holmes had been talking about him. (Tr. III 15). At some point, Petitioner turned his head, and Mr. Holmes jumped up. Petitioner turned around and shot Mr. Holmes in the thigh and then again in the throat as Mr. Holmes stumbled towards him. (Tr. III 16-17). Then, despite the fact Ms. Fields had informed the police during her September 2017, interview right after she was arrested that Mr. Holmes pulled a gun on Petitioner and Petitioner shot in self-defense, she testified that she never saw Mr. Holmes with a firearm. (Tr. III 16, 69, 75). Ms. Fields agreed she was on the run

with Petitioner for approximately three weeks, but claimed she only traveled with Petitioner because she feared him. (Tr. III 45). However, she then admitted during cross examination she had multiple opportunities, when Petitioner left her alone for significant periods of time, where she could have left or called the police. (Tr. III 84, 89, 92, 95, 96, 97).

Petitioner's trial testimony largely followed his statements to law enforcement on key points. He provided additional details in areas not explored fully during his interviews. Petitioner testified that he met Mr. Holmes through Ms. Torres at a mall in Lawton during the week preceding the shooting. He denied ever conversing with Ms. Torres about robbing Mr. Holmes. (Tr. V 134). Petitioner drove from Lawton to Altus with Ms. Fields on August 20, 2017, to collect a drug debt from Ms. Torres. (Tr. V 135). When Petitioner arrived in Altus, he called Ms. Torres to inform her he was in town and on his way to her house. Ms. Torres initially told Petitioner she was in Oklahoma City. (Tr. V 136). However, when Petitioner got angry and told Ms. Torres he would leave, Ms. Torres said she was actually in Lawton, would be home soon, and asked Petitioner to wait for her. (Tr. V 137). Ms. Torres authorized Petitioner to break a window to enter her home if he would pay for the damage. (Tr. V 138). Soon after Petitioner informed Ms. Torres he would be traveling to Altus, Mr. Holmes called Petitioner asking if Petitioner would sell Mr. Holmes a large quantity of cocaine. This conversation made Petitioner nervous. Petitioner told Mr. Holmes he had no cocaine. (Tr. V 136). Mr. Holmes called Petitioner again while Petitioner was at Ms. Torres's house waiting for her to return. Approximately five minutes later, Mr. Holmes knocked on Ms. Torres's front door. When Mr. Holmes entered the home, Petitioner was

sitting at the kitchen table "rolling a blunt." Mr. Holmes joined Petitioner at the kitchen table. Petitioner asked Mr. Holmes if he wanted to smoke with him, but Mr. Holmes declined. (Tr. V 139).

Petitioner got up from the kitchen table and walked towards the refrigerator to get a bottle of water. When he turned around, Mr. Holmes was pointing a gun at him and ordered Petitioner to give Mr. Holmes all of his drugs and money. (Tr. V 140). Ms. Fields screamed. The scream distracted Mr. Holmes, and Petitioner retrieved his gun from the kitchen counter and shot Mr. Holmes. Mr. Holmes lunged towards Petitioner, and Petitioner shot him again. (Tr. V 141). Petitioner stated that he shot Mr. Holmes in self-defense but thought no one would believe him because he had previously served time in the penitentiary. (Tr. V 145). Petitioner left Ms. Torres's house, drove to a Lawton Walmart to buy cleaning supplies, and returned to Ms. Torres's home to clean up and retrieve Mr. Holmes's body. He then drove to Frederick where he discarded Mr. Holmes's body in a creek and burned evidence linking him to the shooting. Petitioner remained on the run until September 7, 2017, when he was arrested by the United States Marshals Office. (Tr. V 146-61).

## VII. GROUNDS

### I. INTRODUCTION OF INADMISSIBLE HEARSAY REGARDING ALLEGED STATEMENTS FROM PETITIONER'S NON-TESTIFYING, CO-DEFENDANT ACCOMPLICE, MELISHA TORRES, THROUGH THIRD PARTY LAW ENFORCEMENT WITNESSES VIOLATED HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL, DUE PROCESS OF LAW, AND CONFRONTATION.

"[F]undamental fairness is the central concern of the Writ of habeas corpus." *Strickland v. Washington*, 466 U.S. 688, 697 (1984). A federal court may grant habeas relief

on such claims only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), *Williams v. Taylor*, 529 U.S. 362, 412 (2000) or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). *Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009) A state court decision is contrary to clearly established federal law under section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Mitchell v. Gibson,* 262 F.3d 1036, 1045 (10th Cir. 2001) (quoting *Williams,* 529 U.S. at 412-13).

"It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be 'diametrically different' and 'mutually opposed' to the Supreme Court decision itself." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006) (quoting *Williams*, 529 U.S. at 406). Petitioner argues that violations of the Confrontation Clause are constitutional and that the burden of proof shifts to the State to demonstrate that the error was harmless beyond a reasonable doubt. The OCCA's opinion was objectively unreasonable as its harmless error analysis under *Chapman v. California*, 386 U.S. 18 (1967) does not sufficiently resolve the error to determine it was harmless beyond a reasonable doubt. This burden cannot be met by merely a recitation of the "overwhelming evidence" mantra but requires proof there is no reasonable probability that the error contributed to the verdict. *Chapman*, 386 U.S. at 23

(questioning value of "overwhelming evidence" standard, which has been "overemphasi[zed]"); *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963).

The Court must apply the harmless-error standard enunciated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which holds that "habeas relief is proper only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Bland*, 459 F.3d at 1009 (quoting *Brecht*, 507 U.S. at 623, 113 S.Ct. 1710). A "substantial and injurious effect" exists when the court holds at least a "grave doubt" about the effect of the error on the jury's verdict. *See O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Grave doubt exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id*. at 435. *See Douglas v. Workman*, 560 F.3d 1156, 1171 (10th Cir. 2009) The Confrontation Clause of the Sixth Amendment provides a criminal defendant the bedrock right "to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36 (2004); *Hemphill v. New York*, 142 S.Ct. 681, 684 (2022).

**A. Factual Support**

During a pre-trial motion hearing on the first day of trial, the State announced its intent to offer co-conspirator/co-defendant statements during its case in chief. (Tr. I 16-17). The following morning, immediately preceding the State's opening statement, the trial court held an in-camera hearing, wherein the State named co-defendants, Ms. Torres and Ryan Fields, and the deceased, Jared Holmes, as coconspirators for the crime of distribution of marijuana. The State requested permission to present testimony from law enforcement officers regarding their interviews with Ms. Torres as co-conspirator non-hearsay under 12

O.S. § 2801 (B)(2)(e) (Tr. II 2). At the conclusion of the hearing, over strenuous objection from defense counsel, the court ruled for the State.[2] (Tr. II 41).

The jury ultimately convicted Petitioner on the State's alternative theory of felony murder with robbery with a dangerous weapon as the underlying felony. The Respondent argued below that "[t]his case is about the defendant's murder of thirty-two (32) year old Jared Holmes during the course of a narcotics-related robbery." At the pre-trial hearing, the State's argument and the trial court's finding regarding the existence of a conspiracy were limited to the underlying felony of distribution of marijuana and not a robbery which was the predicate felony for the jury's determination. However, despite this limited ruling, the State presented tremendous—third-party—prejudicial hearsay regarding alleged statements of Ms. Torres, who did not testify, to law enforcement to support its robbery with a dangerous weapon alternative under the guise of § 2801(B)(2)(e) as co-conspirator non-hearsay.

During its opening statements, the State repeatedly referenced various statements allegedly made by Ms. Torres implicating Petitioner. (Tr. II 54, 55, 56, 63, 64). The State then presented testimony from Altus Police Detectives Uptergrove and Almanza regarding Ms. Torres's alleged statements to police on August 21 and 25, 2017, and September 11, 2017. Detective Uptergrove testified that Ms. Torres told police that Petitioner had told her three days before Mr. Holmes was killed "I want to rob that bitch ass nigga." (Tr.11120).

---

[2] During the hearing, the State presented testimony from Altus Police Detectives Tommy Uptergrove and Colby Earls regarding their interviews with Melisha Torres, but the judge did not review the actual taped interviews with Ms. Torres or transcripts of those taped interviews prepared by the Altus Police Department.

This information was repeated in the State's affidavits to search the 2007 white Dodge Charger owned by Petitioner's mother, which were admitted over objection as State's Exhibits 14 and 15. (Tr. III 169-70, 175). Petitioner's trial counsel objected to the admission of this evidence as hearsay, but his objections were all overruled. (Tr. II I 18; Tr. III 169-70, 175). Finally, Jackson County ADA Robbins used the third-party hearsay accounts of Ms. Torres's alleged conversations with law enforcement as the centerpiece of the State's first closing argument. (Tr. V 231-32, 234-36, 243). In fact, ADA Robbins began the State's first closing argument by highlighting that Ms. Torres met with Petitioner in the days before the murder to talk about Petitioner's plan to rob Mr. Holmes. (Tr. V 231-32).

**B. Argument and Authority**

A statement offered against a party and made by his/her co-conspirator during the course and to further their conspiracy is admissible and is not hearsay. 12 O.S. 2011 § 2801 (B)(2)(e). *See also Omalza v. State*, 1995 OK CR 80, 13,911 P.2d 286, 295-96. A co-conspirator's statements satisfy the requirements of reliability and are admissible as non-hearsay substantive evidence only where the trial court finds: (1) a conspiracy existed; (2) both the defendant and the alleged co-conspirator declarant were parties to the conspiracy; (3) the statements were made during the duration of the conspiracy; and (4) the statements furthered the goals of the conspiracy. *Id*. *Bourjaily v United States*, 483 U.S. 171 (1987); *United States v Stipe*, 653 F.2d 446 (10th Cir. 1981) *U.S. v Taylor*, 802 F.2d 1108, 1117, 1233 (9th Cir 1986) (Statements made by a co-conspirator after his arrest cannot be used against his fellow co-conspirators). Statements made after the completion of the conspiracy are not made during the conspiracy, and therefore are not admissible under § 2801 (B)(2)(e).

*U.S. v Alonzo*, 991 F.2d 1422, (8th Cir. 1993) (Convictions reversed because a co-conspirator's statement made while he was cooperating with the police after his arrest had been improperly admitted against the defendants).

The first and most obvious step in this process is to identify the conspiracy. The State and the trial court clearly identified the conspiracy as the distribution of marijuana. (Tr. II 2, 41). Without identifying the conspiracy, it is impossible to determine the duration of the conspiracy and whether the statements sought to be admitted were made to further the conspiracy. Here, the court's finding that Petitioner and Ms. Torres conspired to distribute marijuana did not give the State license to admit every alleged conversation between Ms. Torres and Petitioner as co-conspirator non-hearsay. Instead, to be admissible as non-hearsay, the conversations must have been made during and in the furtherance of the conspiracy, not before or after the conspiracy. *Jones v. State*, 1987 OK CR 103, ¶ 16, 738 P.2d 525, 527; *Romanov. State*, 1995 OK CR 74, ¶ 40, 909 P.2d 92, 113. *Welch v. State*, I998 OK CR 54, ¶¶ 6·7, 968 P.2d 1231, 1240.

The State's Amended Information clarifies that it believed the distribution of marijuana occurred in Ms. Torres's home in Altus on August 20, 2017. (O.R. 18). According to the State's own witness, Ms. Torres did not even become aware of this alleged drug distribution until Petitioner called her on August 20, 2017. During this call, Ms. Torres claimed Petitioner informed her that Mr. Holmes may call her. Petitioner then allegedly instructed Ms. Torres, if Mr. Holmes called her, to inform Mr. Holmes she and Petitioner would meet him at her house. Ms. Torres was in Oklahoma City on a shopping trip with her daughter. (Tr. II 124, 161). Ms. Torres told police she agreed during a subsequent phone

call, a few minutes later, to allow Petitioner to break a window to enter her home. (Tr. II 122). State's witness, Ryan Fields, testified she was in the vehicle with Petitioner when they arrived at Ms. Torres's house. Ms. Fields, who heard several phone conversations between Petitioner and Ms. Torres, testified that she heard Petitioner voice his displeasure that Ms. Torres was not home and heard Ms. Torres give Petitioner permission to break a window to get inside. (Tr. III I1-12). The State introduced Ms. Torres's phone records which showed eight calls and four text messages between Petitioner's phone and Ms. Torres's phone beginning at 7:02 p.m. on August 20, 2017, and ending at 12:04 p.m. on August 21, 2017. (State's Exhibit 3; Tr. II 142, 166-67). The State's evidence put the time Mr. Holmes was shot sometime around 8:00 p.m. on August 20, 2017. (State's Exhibit 3; Tr. 212-16).

Even if the trial court was correct that Petitioner conspired with Ms. Torres to distribute marijuana on August 20, 2017, the conspiracy did not begin until Petitioner placed the first call to Ms. Torres at 7:02 p.m. that day. In addition, any alleged conspiracy to distribute drugs was completed by no later than the time Mr. Holmes died at approximately 8:00 p.m. on August 17, 2017. All conversations between Petitioner and Ms. Torres during this time frame are documented in Ms. Torres's phone records. There were no calls or texts between Ms. Torres and Petitioner between 7:54 p.m. and 9:41 p.m. (State's Exhibit 3). The only conversations between Ms. Torres and Petitioner which even arguably qualify under the co-conspirator hearsay exception are the conversations between 7:02 p.m. and 7:54 p.m. There is no evidence that these phone conversations were about a plan for Petitioner to rob Mr. Holmes. All other third-party testimony regarding what Ms. Torres allegedly told law enforcement that Petitioner told her is hearsay. Without this inadmissible hearsay evidence,

the State could not have proved its case for robbery with a dangerous weapon or a felony murder predicated on robbery with a dangerous weapon.

The trial court's erroneous admission of Petitioner's alleged out-of-court statements to his non-testifying codefendant/accomplice through the testimony of third-party law enforcement witnesses deprived Petitioner of his fundamental right to confront and cross-examine the witnesses against him. *See Mauox v. United States*, 156 U.S. 237, 242-43 (1895). Because these statements do not fall within any "firmly rooted exception to the hearsay rule," and otherwise lack adequate "indicia of reliability," their admission into evidence violated Petitioner's sixth amendment right to confront Ms. Torres. *See White v. Illinois,* 502 U.S. 346, 353 (1992); *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), *overruled in part by Crawford v. Washington*, 541 U.S. 36 (2004) (leaving intact the Roberts' formulation for "non-testimonial hearsay"). In-custody declarations incriminating others lack the "indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant." *Dutton v. Evans*, 400 U.S. 74, 89 (1970); *see United States v. Riley,* 657 F.2d 1377, 1381-85 (8th Cir. 1981). It cannot be said beyond a reasonable doubt this error, viewed alone or combined with the numerous other prejudicial errors that permeated Petitioner's trial, did not contribute to the verdict.

The OCCA's ruling that the post-arrest statements to law enforcement officials was clearly erroneous because they do not demonstrate they are made to further a conspiracy. As the Supreme Court said in *Fiswick v. United States*, 329 U.S. 211, 217 (1946):

> [C]onfession or admission by one co-conspirator after he has been apprehended is not in any sense a furtherance of the criminal enterprise. It is rather a frustration of it.... So far as each conspirator who confessed was concerned, the plot was then terminated. He thereupon ceased to act in the role of a conspirator. His admissions were therefore not admissible against his erstwhile fellow-conspirators.

*See also Wong Sun v. United States*, 371 U.S. 471, 490 (1963).

## II. THE STATE'S EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE ALL THE ELEMENTS OF ROBBERY WITH A DANGEROUS WEAPON AND, THEREFORE, ALSO INSUFFICIENT TO SUPPORT PETITIONER'S CONVICTION FOR FIRST DEGREE FELONY MURDER BASED ON THAT UNDERLYING FELONY.

Petitioner was charged with alternative theories of first-degree felony murder with robbery with a dangerous weapon and in the commission of a drug transaction serving as the possible predicate felonies. (O.R. 110-102). The jury was instructed on both theories and provided a separate verdict form for each alternative. However, the jury only returned a guilty verdict on the theory alleging robbery with a dangerous weapon as the predicate felony. (O.R. 165).

The Due Process Clause of the United States Constitution and corresponding provisions of the Oklahoma Constitution protect a criminal defendant against conviction except upon proof beyond a reasonable doubt of every element of the offense. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970). The standard of proof beyond a reasonable doubt is designed to impress upon the fact finder the need to reach a subjective state of near certitude of the guilt of the accused. *Jackson*, 443 U.S. at 315.

The discretion to resolve conflicting testimony, weigh evidence, and determine the credibility of witness testimony lies with the jury. *Johnson v. State*, 2004 OK CR 23, ¶ 10, 93 P.3d 41, 44-45. Still, the evidence relied upon for a conviction must raise more than a mere suspicion of guilt, *See United States v. Jameson*, 478 F.3d 1204, 1208 (10th Cir. 2007) *overruled in part on other grounds by U.S. v. Little*, 829 F.3d 1177 (10th Cir.2015); *cf Fields v. State*, 1983 OK CR 106,1113, 666 P.2d 1301, 1304 ("a conviction cannot stand where the evidence establishes no more than a mere suspicion of guilt").

Under a felony murder theory, the State is absolved of the responsibility of proving the murder was intentional. Malice aforethought or premeditated intent is imputed simply by proof of a death occurring during, or as a result of, the commission of an inherently dangerous felony. Therefore, it is critical for the State to prove the defendant's guilt of the underlying felony-the substitute for intent to kill beyond a reasonable doubt. *See Wade v. State*, 1978 OK CR 77, ¶ 3,581 P.2d 914, 916.

At trial, the State had to prove beyond a reasonable doubt that Petitioner committed the offense of first-degree felony murder during the commission of robbery with a dangerous weapon. Even taking the evidence in the light most favorable to the State, no rational trier of fact could have found beyond a reasonable doubt that Petitioner had the requisite intent to rob Mr. Holmes. Petitioner's jury was instructed the elements of robbery with a dangerous weapon are: (1) wrongful; (2) taking; (3) carrying away; (4) personal property; (5) of another; (6) from the person of another; (7) by force/fear; (8) through use of a loaded firearm. Instruction Nos. 4-64 and 4-144, OUJI-CR (2d) (O.R. 144), *see also* 21 O.S.2011, § 801.

The jury was instructed further that it could only convict Petitioner of being in the commission of robbery with a dangerous weapon" if he was "performing an act which is an inseparable part of or performing an act which is necessary in order to complete the course of conduct constituting robbery with a dangerous weapon." Instruction No. 4-65, OUJI-CR (2d) (O.R. 145).

The only evidence the State presented to support its theory that Mr. Holmes was killed while Petitioner was "in the commission of robbery with a dangerous weapon" came through the testimony of Altus Police Detective Uptergrove, who recounted information he claimed Ms. Torres provided during an August 25, 2017, interview with law enforcement. Detective Uptergrove testified Ms. Torres told him Petitioner had expressed a desire to rob Mr. Holmes during a conversation in Lawton on August 17, 2017. (Tr. II 120). Detective Uptergrove testified further that Ms. Torres told him she believed, based on her phone conversations with Petitioner on August 20, 2017, that Petitioner "was going to rob Jared Holmes" and Petitioner told her after the fact that he and someone he described as "a bitch" had ''robbed or had stripped and robbed and bound Jared Holmes." (Tr. II 121, 123).

Other State's witnesses either contradicted or did not support Detective Uptergrove's account. Detectives Almanza and Earls, the other two officers who spoke with Ms. Torres during the investigation, and Ms. Torres's mother, Brenda Torres, who testified about a telephone conversation she allegedly overheard between her daughter and Petitioner, were never asked whether Ms. Torres mentioned a robbery or a plan to rob Mr. Holmes. (Tr. II 94-113; Tr. III 164-208; Tr. V 79-116).

State's witness Ryan Fields, who was charged as a co-defendant with first degree murder before agreeing to testify against Petitioner in exchange for a reduced charge and a fifteen year or less sentence, provided no evidence to support the State's robbery theory. Ms. Fields testified she believed that she and Petitioner had traveled to Lawton "to meet up with [Ms. Torres]" because Ms. Torres had "set up a drug deal." (Tr. III 8). Ms. Fields testified that it was clear to her from the phone conversations between Petitioner and Ms. Torres she heard on Bluetooth in Petitioner's car that Ms. Torres was supposed to meet Petitioner at Ms. Torres's house. Ms. Fields specifically recalled hearing Petitioner tell Ms. Torres "[y]ou were supposed to be at the house" and "[y]ou know I need this money... (Tr. III 11)

When asked again more specifically regarding what actually happened when they arrived, Ms. Fields said nothing about a robbery. She instead testified that Petitioner shot Mr. Holmes because he believed Mr. Holmes had been talking about him. (Tr. III 14-15, 93).

Ms. Fields never mentioned that Petitioner demanded Mr. Holmes tum over any personal property or observed Petitioner take any personal property from Mr. Holmes before shooting him. When the State asked Ms. Fields what was taken out of Ms. Torres's home after the shooting, she testified that Petitioner only took the items he brought in the house and not did not mention Petitioner taking anything Mr. Holmes brought into the house. (Tr. III I8-19). Petitioner drove Mr. Holmes's vehicle, which was parked outside the house, away from the scene, but this was after the shooting. (Tr. III 19).

The only mention of Petitioner taking any personal property of Mr. Holmes was during Ms. Fields's testimony regarding events which occurred after Petitioner and Ms. Fields had disposed of Mr. Holmes's body and were burning his clothes. When the State asked "did y'all ever find any money on Jared," Ms. Fields stated, "Trey did," When asked what happened to this money, she stated "I believe he kept it." (Tr. III 34) (Emphasis added).

Finally, Petitioner testified he shot Mr. Holmes in self-defense after Mr. Holmes attempted to rob him at gunpoint. (Tr. V 139-40). Petitioner denied robbing Mr. Holmes. Instead, he testified he drove from Lawton to Ms. Torres's house in Altus to collect a drug debt. (Tr. V 135). When he arrived in Altus, Ms. Torres was not home, but she told him during a phone conversation she was on her way home and asked him to wait for her. (Tr. V 136-37). While Petitioner waited for Ms. Torres to return home, Mr. Holmes arrived. Soon after Mr. Holmes entered Ms. Torres's house, Mr. Holmes pulled a gun on Petitioner and demanded Petitioner give him all Petitioner's drugs and money. (Tr. V 140). Petitioner then shot Mr. Holmes in self-defense. (Tr. V 141, 145).

Petitioner argues that no rational trier of fact could have found beyond a reasonable doubt that Petitioner robbed Mr. Holmes. Therefore, Petitioner's conviction for felony murder predicated on this offense rests on insufficient evidence in violation of the Due Process Clause of the Fifth and Fourteenth Amendments. *See Jackson v. Virginia*, 443 U.S. 307 (1979). The OCCA determined, "[t]he fact there was no evidence Smith uttered a demand for Holmes's property or announced an intent to rob him before fatally shooting him does not negate a finding that a robbery was in progress when Smith pointed a gun at

him…." The OCCA's adjudication of this proposition was objectively unreasonable because the constitutional violations cannot be said to be harmless beyond a reasonable doubt nor can the alleged facts of a robbery be supported by corroboration.

## III. THE INTRODUCTION OF THE STATE'S PROBABLE CAUSE AFFIDAVITS SUBMITTED IN SUPPORT OF ITS WARRANTS TO SEARCH THE VEHICLE OWNED BY PETITIONER'S MOTHER CONTAINED IRRELEVANT AND PREJUDICIAL HEARSAY IN VIOLATION OF PETITIONER'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL, DUE PROCESS OF LAW, AND CONFRONTATION.

During the testimony of Detective Jonathan Almanza, the State introduced two probable cause affidavits that law enforcement submitted during its investigation to obtain warrants to search the 2007 white Dodge Charged owned by Petitioner's mother. These documents contained an extensive account of Detective Almanza's interviews with Petitioner's non-testifying co-defendant Ms. Torres, law enforcement's interview with Ms. Torres's mother, Brenda Torres, Detective Almanza's conversations with other law enforcement officers, and Almanza's interview with Mario Garrido, Ms. Torres's across the street neighbor, who did not testify. (Tr. III 165-175; State's Exhibits 14 and I5). When the State attempted to admit State's Exhibit 14, trial counsel objected on the basis that the document contained inadmissible hearsay. (Tr. III 167). The State urged the court to overrule the objection because the court had ruled previously that Ms. Torres's statements to law enforcement could be admitted as co-conspirator non-hearsay. (Tr. III 168). The court overruled the objection as it related to the previous ruling regarding Ms. Torres being a co-conspirator but agreed to entertain other unrelated objections. (Tr. III 169). Trial

counsel repeated his hearsay objection when the State requested admission of State's Exhibit 15, but the trial court again overruled his objection. (Tr. III 175).

Trial counsel did not object to any information contained in State's Exhibits 14 and 15 other than the alleged statements of Ms. Torres to law enforcement. Even assuming the trial court was correct in its ruling regarding the existence of a conspiracy between Petitioner and Ms. Torres to distribute drugs to Mr. Holmes, not everything Ms. Torres told law enforcement qualified as co-conspirator non-hearsay. Much of the information in the affidavits that Detective Almanza claimed Ms. Torres told him was outside the scope of any possible conspiracy because it transpired long after the alleged drug transaction would have been completed. *See Romanov. State*, 1995 OK CR 74, ¶ 40, 909 P.2d 92, 113. In the affidavits, Detective Almanza stated that Ms. Torres told him on August 21, 2017, that "Marielle Trey 'Toon' Smith confessed to murdering Jared Holmes, hereafter referred to as the Victim, in her residence (408 N. Julian) the night prior." Detective Almanza stated further that "Torres advised that Smith threatened her life, warning her not to tell anyone." (State's Exhibits 14and 15). Detective Almanza and other Altus Police Officers testified in detail regarding their interviews with Ms. Torres.

**However, none of the officers testified that Ms. Torres told them that Petitioner "confessed to murdering Jared Holmes" or "threatened her life."**

However, because the inadmissible hearsay created a Confrontation Clause error, which is constitutional in nature, the burden then shifts to the State to demonstrate that the error was harmless beyond a reasonable doubt. As Petitioner discussed above the OCCA's

resolution of Petitioner's constitutional claims were objectively unreasonable under *Chapman v. California*, 386 U.S. 18 (1967).

**A. Hearsay**

Hearsay is defined as "a statement, other than one made by declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." 12 O.S.2011 § 2801 (A)(3). Generally, hearsay is not admissible; however, there are exceptions to the hearsay rule under State law. 12 O.S. 2011 §§ 2802, 2803, 2804, 2804.1. When a statement does not fall within an exception, that hearsay is otherwise inadmissible. *Pullen v. State*, 2016 OK CR 18, ¶ 11, 387 P.3d 922, 927. Detective Almanza's account of what Ms. Torres allegedly told him does not fall within any of the recognized hearsay exceptions. In addition, even if this Court finds the evidence was either not hearsay or qualified as a hearsay exception, it must still be evaluated for a determination of whether its probative value was substantially outweighed by the anger of unfair prejudice. *See Wall v. State*, 1988 OK CR 125, ¶ 6, 763 P.2d 103, 105-106; 12 O.S.2011 § 2403. There is no question this evidence, which informed the jury Petitioner "confessed to murder" and threatened to kill his co-defendant if she told anyone, was highly prejudicial.

Law enforcement reports prepared in anticipation of protection offered by the government are specifically identified as inadmissible hearsay. 12 O.S.2011, § 2803 (8)(a) and (b). *See Humphries v. State*, 1997 OK CR 59, ¶ 25, 947 P.2d 565, 575; *Salazar v. State*, 1998 OK CR 70, ¶ 22, 973 P.2d 315, 324. They fall within the prohibited category of a "matter as to which the sources of information or other circumstances indicate lack of

trustworthiness." 12 O.S.2011 §2803(8)(e). A sworn probable cause affidavit prepared by a police officer clearly falls within this category.

**B. Confrontation Clause Violation**

In addition to constituting inadmissible hearsay, this evidence violated Petitioner's Confrontation Clause rights. The Constitution guarantees a person accused in a criminal proceeding the right "to be confronted with the witnesses against him." *Pointer v. Texas,* 380 U.S. 400, 404-08 (1965). This is necessary "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversarial proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

Statements made to a police officer gathering evidence for court use are clearly testimonial in nature and inadmissible. *Crawford v. Washington*, 541 U.S. 36, 51-52, 68 (2004). Unlike the OCCA's opinion in *Frederick v. State*, 2017 OK CR 12, 400 P.3d 786, there was "no ongoing emergency" in this case to render Ms. Torres's alleged statements to police "nontestimonial." *Frederick*, at 45-46, 400 P.3d at 806 *(overruled on other grounds by Williamson v. State,* 2018 OK CR 15, 422 P.3d 752). *See also Davis v. Washington*, 547 U.S. 813, 822 (2006); *Michigan v. Bryant*, 562 U.S. 344, 359 (2011)

It is impossible to determine beyond a reasonable doubt that the introduction of State's Exhibits 14 and 15, containing a third-party account from Petitioner's non-testifying co-defendant stating Petitioner confessed to murder, did not affect the jury's verdict and thus the OCCA's opinion was objectively unreasonable because of its harmless error resolution under *Chapman*, 386 U.S. at 24.

**C. Relevance**

In addition to constituting inadmissible hearsay, the second-hand statements attributed to Ms. Torres in State's Exhibits 14 and 15 were not relevant to the State's alleged reason for admitting the affidavit for search warrant. The State's reason for admitting the documents during the testimony of Detective Almanza was to demonstrate that he followed the proper protocol when he obtained the warrants to get GPS information from the vehicle owned by Petitioner's mother. (Tr.11340).

Officer Almanza's testimony on this topic should have sufficed to prove this uncontested fact. If documentation was needed to prove this point, the State should have used just the warrant itself. A most basic evidentiary rule is that "[e]vidence which is not relevant is not admissible." 12 O.S.2011, § 2402. To be relevant, evidence must have a tendency to make the existence of any fact of consequence to the determination of the action more probable or Jess probable than it would be without the evidence. *Id*., § 2401; See *Omalza v. State*, 1995 OK CR 80, ¶ 61, 911 P.2d 286, 304-05. The details Ms. Torres allegedly provided to Detective Almanza regarding Petitioner's involvement in Mr. Holmes's death are certainly not relevant to the GPS data Detective Almanza obtained from Petitioner's mother's vehicle.

**D. Conclusion**

The admission of this evidence served no other purpose than to permit the State to backdoor inadmissible police reports to allow the introduction of hearsay which allowed Sixth Amendment violation to occur. The alleged statement from Ms. Torres which she told police Petitioner lured Mr. Holmes to Ms. Torres's house, murdered him, and then

threatened to kill Ms. Torres if she told anyone, was prejudicial and Petitioner had the right to confront her because he has the right to impeach her and the officer's making the claim this occurred. This Court should grant a conditional writ and Order that Petitioner be retried within 180 days.

**IV. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PERMITTING DETECTIVE EARLS TO GIVE IRRELEVANT AND IMPROPER OPINION TESTIMONY IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS OF LAW.**

"A fundamental premise of our criminal trial system is that the jury is the lie detector." *United States v. Scheffer*, 523 U.S. 303, 313 (1998) (quoting *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973), *cert. denied*, 416 U.S. 959 (1974)). "Determining the weight and credibility of witness testimony, therefore, has long been held to be the part of every case belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *Scheffer*, 523 U.S. at 313 (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891)). *See also Jackson v. Denno*, 378 U.S. 368, 387 (1964) (questions of credibility, whether of a witness or a confession, are for the jury).

"Under our system of criminal jurisprudence, the jury are the exclusive judges of the weight and credibility to be given the testimony of a witness." *Hill v. State*, 1943 OK CR 55, 137 P.2d 261, 268 (reversed due to trial courts comment on the evidence). 12 O.S. § 2704 provides that an expert's testimony in the form of an opinion or inference, otherwise admissible, is not objectionable because it embraces an ultimate issue to be decided by the trial of fact. However, if an expert's opinion directs the jury what result to reach, the

opinion is inadmissible. *Romano v. State*, 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109; *Moore v. State*, 1990 OK CR 5, ¶ 49, 788 P.2d 387, 399. “An opinion as to the defendant’s guilt is an improper lay or expert opinion because the determination of the defendant’s guilt or innocence is solely a question for the trier of fact.” *McCarty v. State*, 1988 OK CR 271,117,765 P.2d 1215, 1218.

During the State’s re-direct examination of its last witness, Altus Detective Colby Earls, DA Thomas asked a series of questions regarding whether Earls believed, based on his training and experience as a detective, if Petitioner’s actions were consistent with those of an innocent man. Detective Earls answered no to each question. (Tr. V 108-113). Then during closing arguments, DA Thomas repeatedly referenced this improper line of questioning in his bid to obtain a guilty verdict and life without parole sentence. (Tr. V 288-89, 295, 308).

While Detective Earls was qualified to conduct his investigation and discuss the facts surrounding law enforcement’s investigation, he was not, however, more qualified than the jurors to opine on the ultimate issue to be decided in this case, i.e., whether the facts of the case amounted to self-defense or murder. Detective Earls’ opinions were improperly and prejudicially injected under the guise, and with the authority of, his expertise as a law enforcement officer. His opinions on the truthfulness or untruthfulness of Petitioner’s statements and his opinion on Petitioner’s guilt were prejudicial and inadmissible.

This Court has held that opinions embracing issues of fact before the jury constitute reversible error when the jurors are as capable as the witness to draw appropriate

conclusions from the evidence. *Gabus v. Harvey*, 1984 OK CR 4, ¶ 10-16, 678 P .2d 253, 255. In Petitioner's case, the jury was perfectly capable of drawing its own conclusions regarding whether Petitioner's actions were consistent with him being guilty of the charged offenses. In fact, this was the jury's entire purpose for being there. Additionally, admission of Detective Earls' personal opinion regarding Petitioner's guilt was more prejudicial than probative because it carried the substantial weight and credibility of an expert opinion and was therefore inadmissible under 12 O.S. § 2403.

Petitioner recognizes the lack of objection from his trial counsel limits this Court's review to a plain error analysis. *See Simpson v. State*, 1994OK CR40, ¶ 10-11, 16, 876 P.2d 690, 694-95. Petitioner argues that the OCCA's resolution of his claims warrant federal habeas relief because the invasion of the province of the jury by Detective Earls violated Petitioner's Fourteenth Amendment rights and so infected his trial with unfairness as to make his resulting conviction a denial of due process. *Darden v. Wainwright*,477 U.S. 168, 181 (1986). *See Stermer v. Warren*, 959 F.3d 704 (6th Cir. 2020) affirming the grant of a writ because Stermer had been denied a fundamentally fair trial. Petitioner urges below his trial counsel was ineffective for failing to object to this improper and inadmissible testimony which cannot be said to be harmless beyond a reasonable doubt.

## V. PETITIONER WAS DENIED HIS RIGHT TO A FAIR TRIAL BECAUSE THE COURT DID NOT IDENTIFY RYAN FIELDS AS AN ACCOMPLICE OR INSTRUCT THE JURY, SHE WAS AN ACCOMPLICE AS A MATIER OF LAW.

Trial courts have a duty to instruct the jury on salient features of the law raised by the evidence with or without a request. *See Hogan v. State*,2006 OK CR 19, ¶ 38, 139 P.3d

907, 923; *Williams v. State*, 2001 OK CR 9, ¶ 39, 22 P.3d 702, 712-13. *Atterberry v. State*, 1986 OK CR 186, ¶ 8, 731 P.2d 420, 422. It is the trial court's duty to assess whether witnesses are accomplices and instruct the jury accordingly. Once the trial court determines accomplice instructions are necessary, the court must identify the person who is an accomplice and provide an instruction whether the person identified is an accomplice as a matter of law. Even if the court determines the level of the identified person's participation does not rise lo the level for that person to be considered an accomplice as a matter of law, the court must still identify the person and provide the jury an instruction permitting the jury to determine whether the person in question is an accomplice. *See Davis v. State*, 1990 OK CR 20, ¶ 8, 792 P.2d 76, 83; *Bryson v. State*,1994 OK CR 32, 39, 76 P.2d 240, 256; *Nunley v. State*, 1979 OK CR 107, ¶ 10, 601 P.2d 459, 462-463; and OUJI-CR (2d) 9-29 and 9-30.

To be an accomplice, the actions of the witness must put him/her within the scope of 21 O.S.2001 § 172, which provides: "All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals." If under all the facts, ''the conduct of the witness is such that he could be indicted for the offense with which the defendant stands accused, the witness is an accomplice." *See also Cummings v. State*, 1998 OK CR 45, ¶ 19, 968 P.2d 821, 830. If the State's case includes the testimony of an accomplice, the trial court must instruct the jurors regarding the requisite corroboration of that testimony to ensure that a conviction rests on a basis other

than the unsupported testimony of a witness whose motives for testifying may be questionable.

Here, although Ms. Fields, who was charged and convicted as a co-defendant, was unquestionably an accomplice as a matter of law, no instructions were provided. Petitioner acknowledges that his trial counsel failed to request these instructions which limits this Court's review to a plain error analysis. *Harris v. State*, 2007 OK CR 28, ¶ 25, 164 P.3d 1103, 1107-08. If this Court determines this issue was not properly preserved for appeal because trial counsel failed to object or proffer the correct instructions, then under the particular facts of this case counsel's omissions amounted to plain error. *See Simpson v. Slate*, 1994 OK CR 40, ¶ 12,876 P.2d 690, 698; *Hogan v. State*, 2006 OK CR 19, 138, 139 P.3d 907, 923.

Ms. Fields was the State's only witness who provided an eyewitness account. Ms. Fields initially informed police Petitioner shot Mr. Holmes in self-defense after Mr. Holmes pulled a gun. However, after receiving a plea offer from the State, she completely changed her story and testified in Petitioner's trial that Mr. Holmes did not have a weapon and did not threaten Petitioner. Ms. Fields was the only witness the State presented to contradict Petitioner's self-defense story. The lack of instruction on this issue resulted in Petitioner's jury being completely unaware that it could not convict Petitioner on the self-serving testimony of Ms. Fields on this key point. The incomplete instruction denied Petitioner a due process right to a fair trial because a jury must be instructed to preclude the possibility that the conviction rests on an incorrect legal basis. *United States v.*

*Zimmerman*, 943 F.2d 1204, 1214 (10th Cir. 1991). This lack of legal guidance rendered the verdict unreliable and a denial of fundamental fairness.

## VI. THE STATE'S MISCONDUCT DENIED PETITIONER OF A FAIR TRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Counsel for the State crossed ethical boundaries more than once during Petitioner's trial. Here, trial counsel objected to some, but not all, objectionable conduct. Absent contemporaneous objections, this Court reviews claims of prosecutorial misconduct for plain error. *Malone v. State*, 2013 OK CR 1, ¶ 40, 293 P.2d 198, 211. To be entitled to relief under the plain error doctrine, the appellant must prove: (1) the existence of an actual error (*i.e.,* deviation from a legal rule); (2) that the error is plain or obvious; and (3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding. *Hogan v. State*, 139 P.3d at 923.

The OCCA has not hesitated to review and redress claims of prosecutorial misconduct where, as here, the prejudice to the accused's right to a fair trial is manifest. *See Tobler v. State*, 1984 OK CR 90, ¶ 13, 688 P.2d 350, 353 ("We will review these assignments of error because there is no right which is more essential to an accused's defense than the right to a fair trial free from prejudice."). Additionally, any doubt about whether the remarks by the prosecution were improper should be resolved for the accused. *Sykes v. State*, 1951 OK CR 154 ¶ 18, 238 P.2d 384, 388.

### A. Demeaning and Disparaging Petitioner During Cross Examination and Closing Arguments

During cross-examination, the prosecutor repeatedly badgered, belittled, and ridiculed Petitioner. This conduct drew repeated objections from Petitioner's trial counsel, all of which were overruled. (Tr. V 170, 173, 178, 179, 192). It is clear from the record that DA Thomas's ridicule of Petitioner did not go unnoticed by courtroom observers. Early in DA Thomas's cross-examination of Petitioner, Judge Huey had to instruct the gallery not to laugh or make gestures during the questioning. One of the observers in the gallery continued this behavior and had to be removed from the courtroom. (Tr. V 171-72). Twice, trial counsel objected because DA Thomas was "getting in my clients face." (Tr. V 178, 192). At one point, after making repeated comments/questions suggesting he personally believed Petitioner was guilty, DA Thomas asked Petitioner if he was on "Tune and Ryan's excellent innocence adventure." (Tr. V 176). It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying. *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005).

"The prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985). The prosecution's disparaging attitude and improper opinions on Petitioner's guilt continued during closing arguments. DA Thomas began the State's second closing argument by apologizing to all young black men in the courtroom for any implication they are like Petitioner. (Tr. V 288). DA Thomas told the jury "M-Fer" was the only word Petitioner had in his vocabulary. (Tr. V 290). He

then said if Petitioner really felt remorse, he should wipe the "smirk off of his face." (Tr. V 291). DA Thomas called Petitioner "a walking wrongful act selling lies and selling death" and made a plethora of additional comments regarding his opinion that Petitioner was a liar and guilty of murder. (Tr. V 289, 292, 293, 294, 298, 300, 301).

[N]early a century in *Berger v. United States*, 295 U.S. 78, 88 (1935), the Court laid the groundwork for identifying, and remedying, prosecutorial misconduct to ensure the protection of the rights of the accused. The Court explained that although prosecutors "may strike hard blows," they are "not at liberty to strike foul ones." *Id.* In other words, "[i]t is as much [their] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.*

Here, the prosecutor's disparaging treatment of Petitioner and repeated inflammatory comments regarding Petitioner's guilt constituted prosecutorial misconduct which infected the trial with unfairness and produced an unreliable result just as the OCCA's opinion was objectively unreasonable.

### B. Eliciting Misleading and/or False Testimony Regarding Melisa Torres

The only evidence the State presented to support its theory that Mr. Holmes was killed while Petitioner was "in the commission of robbery with a dangerous weapon" came through the testimony of Detective Uptergrove, who recounted information he claimed Ms. Torres provided during an August 25, 2017, interview. Detective Uptergrove testified that Ms. Torres told him she believed, based on her phone conversations with Petitioner on August 20, 2017, that Petitioner "was going to rob Jared Holmes." (Tr. II 121). Detective

Uptergrove then testified that Ms. Torres told him Petitioner told her someone he described as “a bitch” had “robbed or had stripped and robbed and bound Jared Holmes.” (Tr. II 123). Ms. Torres did not testify and none of her recorded, transcribed interviews were admitted or shown to the jury. The State used these third-party hearsay accounts of Ms. Torres’s alleged conversations with law enforcement as the centerpiece for its opening statements and closing arguments. (Tr. II 54, 55, 56, 63, 64; Tr. V 231-32, 234-36, 243).

Trial counsel objected to the admission of this testimony because it was hearsay but made no other objections. (Tr. II 118; Tr. III 170). Counsel also failed to attempt to impeach Detective Uptergrove with the transcription of his August 25,2017, interview with Ms. Torres or transcriptions from any other law enforcement recorded interviews with Ms. Torres. Detective Uptergrove’s testimonial account of Ms. Torres’s statements to him on the key point of whether Petitioner planned or committed a robbery is misleading. During the August 25, 2017, interview, Detective Uptergrove asked Ms. Torres repeatedly whether she knew or believed that Petitioner was meeting Mr. Holmes in her home on August 20, 2017, because Petitioner planned to rob Mr. Holmes. Ms. Torres told Detective Uptergrove that Petitioner had talked about robbing Mr. Holmes several days before August 21, 2017, but repeatedly denied any knowledge that Petitioner planned to rob Mr. Holmes in her home in Altus on August 20,2017.” (3.11 Application Attachment 1, Exhibit 1, pages 36, 37, 40, 46, 50, 52, 53, 54, 55, 56, 57, 68).

Detective Uptergrove’s testimony that Ms. Torres told him during the August 25, 2017, interview that Petitioner told her someone he described as “a bitch” had “robbed or and robbed and bound Jared Holmes” was false. (Tr. II 123). Although Ms. Torres told

Detective Uptergrove that Petitioner said he had Mr. Holmes "strip butt naked" and "some bitch" tied Mr. Holmes up, Ms. Torres never told Detective Uptergrove that Petitioner confessed to robbing Mr. Holmes. (3.11 Application Attachment I, Exhibit I, pages 27-28). Later in the interview, Ms. Torres stated specifically "no, he didn't tell me anything about even robbing him. All he told me was he shot him twice that's it." (3.11 Application Attachment 1, Exhibit 1, page 68).

Detective Uptergrove continued this line of questioning during a September 11, 20 I7, interview. Like in the earlier interview, Ms. Torres denied having any knowledge Petitioner intended to rob Mr. Holmes on August 20, 2017, or of Petitioner confessing that he robbed Mr. Holmes. (3.11 Application Attachment 1, Exhibit 2, pages 17, 18,25, 26, 38, 39, 41, 36, 37, 40, 46, 50, 52, 53, 54, 55, 56, 57, 68). Neither Ms. Torres nor the detectives mentioned anything about a robbery during their August 21, 2017, interview. (3.11 Application Attachment 1, Exhibit 3).

While the *Brady v. Maryland*, 373 U.S. 83 (1963), line of cases are generally cited in discussions involving questions of whether the State disclosed exculpatory/impeachment evidence to the defense, this line of cases also prohibits the State from presenting evidence and/or argument it knows or should know is false or misleading. "Deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (prosecutor's attempt to convey erroneous impression to the jury constitutes error). *See also Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974); *Miller v. Pate*, 386 U.S. 1, 7 (1967); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Paxton v. Ward*, 199 F.3d

1197, 1216-18 (10th Cir. 1999); *Brown v. Wainwright*, 785 F.2d 1457, 1463-64 (11th Cir. 1986). Under this framework, no distinction is recognized between evidence that exculpates a defendant and "evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest." *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Here, the State presented false testimony on the critical point of whether Petitioner told Ms. Torres that he robbed Mr. Holmes. The State then relied on this misleading and false testimony during its closing arguments in its bid to convince the jury Petitioner killed Mr. Holmes during a robbery and to sentence him to the harshest punishment of life without parole. (Tr. V 231-32, 234-36, 243). There can be no question whether this obvious misconduct contributed to the outcome. Ms. Torres did not testify, and Detective Uptergrove's testimony regarding what Ms. Torres allegedly told him was the only evidence the State presented to support its case for robbery.

Petitioner presented a related claim below alleging that his trial counsel was ineffective for failing to use the transcripts of law enforcement interviews with Ms. Torres to impeach Detective Uptergrove's false testimony regarding whether Ms. Torres told him that Petitioner confessed to, robbing Mr. Holmes and failing to object when lheS1a1e relied on Detective Uptergrove's false testimony later during its closing arguments.

**C. Societal Alarm**

Argument regarding societal alarm is substantially more prejudicial than probative. As this type of misconduct, thwart(s) the basic principle that the role of the jury is to determine only the guilt or innocence of the accused and is offensive to the sense of justice

and intolerable to this Court. In the State's closing, DA Thomas suggested, if the jury did not find Petitioner guilty, they would be responsible for allowing "every drug dealer to kill, destroy evidence, run from the law, and then come in here and say, self-defense." (Tr. V 294-95). DA Thomas ended the State's second-stage closing argument with an emotional plea urging the jury to find Petitioner guilty and impose the maximum punishment of life without parole to provide "justice" for Mr. Holmes and to keep themselves and other members of society safe. (Tr. V 309-310).

Here, the prosecution's conduct so infected Petitioner's trial with unfairness that his convictions and sentences violate his right to due process of law where the OCCA's resolution of his claims were objectively unreasonable under *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) and *Donnelly v. DeChristoforo*,416 U.S. 637, 643 (1974) and it cannot be overstated that the constitutional violations impacted the trial as to make the trial verdict unreliable.

## VII. PETITIONER WAS DENIED A FAIR TRIAL BEFORE AN UNBIASED JURY BY THE SEATING OF LONGTIME, FORMER ALTUS POLICE OFFICER, JUROR S.M.

A criminal defendant is entitled to a fair and unbiased jury. *Irvin v. Dowd*, 366 U.S. 717, 721-722 (1961); U.S. Const. amends. VI, XIV. Actual bias occurs "when a juror's views 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." *Wainwright v. Witt*, 469 U.S.412,424 (1985). Such bias need not be proved with "unmistakable clarity." *Matthews v. State*, 2002 OK CR 16, ¶ 16, 45 P.3d 907, 915. "Further, a juror who cannot impartially decide guilt violates his oath and this is a proper challenge for cause." *Warner v. State*, 2001 OK CR 11, ¶ 16, 29 P.3d

at 572. In addition, statutory law requires that a juror be excluded for actual or implied bias. 38 O.S.2011, § 659. *Rojem v. State*, 2006 OK CR 7, 132, 130 P.3d 287, 295.

Petitioner recognizes that his trial counsel failed to object and/or remove juror S.M. He presented a related claim below alleging that his counsel was ineffective for failing to do so. When S.M. was asked if she had any experiences which might prohibit her "from being fair and impartial in this case," she disclosed that she had worked as a law enforcement officer for over 21 years with the Altus Police Department. When pressed further on the issue, S.M. also disclosed that she had worked with the officers involved in the investigation of Petitioner's case who were listed to be called as State's witnesses at trial. S.M. stated specifically: "I trust their investigative skills. I worked with them for a long time. And if the evidence is there to say that, you know, this crime was committed, then I'm going to be likely to go with what my coworkers and fellow police officers say." (Tr. I 86). These answers clearly contradicted any later representations made by S.M. that she could be fair and impartial. (Tr. I 86-87). In her pre-trial juror questionnaire, S.M. disclosed not only that she had served as an Altus Police Officer from 1992 until her retirement in 2013, but also that her husband had served as an Altus police officer from 1989-2012.

Petitioner recognizes that the statutory prohibition regarding law enforcement being automatically ineligible to serve on juries in criminal cases applies to active rather than retired officers. 38 O.S.2011, § 28 (8)(4) The United States Constitution guarantees the right to a fair trial before an impartial jury. U.S. Const. amend. VI. One biased or prejudiced juror is enough to require remand to assure the appellant receives a fair trial." *Enriquez v.*

*State,* 1987 OK CR 164, ¶ 8, 740 P.2d 1204, 1205-1206. *See also Parker v. Gladden*, 385 U.S. 363, 366 (1966) (defendant entitled to twelve, not nine or even ten, impartial jurors). Even on the limited record, S.M. favored the State which cause her to be biased against Petitioner. Petitioner is entitled to a new trial with twelve unbiased jurors.

## VIII. PETITIONER WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The Sixth Amendment guarantees a defendant's right to the assistance of counsel in criminal proceedings. *Strickland* at 686. To establish a Sixth Amendment violation, a defendant must demonstrate deficient performance and resulting prejudice. *Id.* at 687. "The proper measure of attorney performance [is] simply reasonableness under prevailing professional norms." *Id.* at 688. And resulting prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 693-94.

The *Strickland* standard is "highly deferential" and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. Under § 2254(d), habeas review of a *Strickland* claim adjudicated on the merits in state court is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. at 105. And because "[t]he

*Strickland* standard is a general one ... the range of reasonable applications is substantial," making it even more difficult for a habeas petitioner to show that the state court's application of *Strickland* was objectively unreasonable. *Richter*, 562 U.S. at 105.

Here, Mr. Smith was prejudiced by his trial attorney's failure to adequately argue the law limiting the scope of co-conspirator non-hearsay testimony—to object when a law enforcement officer provided opinion testimony on the ultimate issue of fact—Petitioner's guilt—to request an accomplice instruction for testifying co-defendant Ryan Fields—to object to blatant prosecutorial misconduct—to remove a biased juror—and to use the discovery provided by the State to support Petitioner's defense. A portion of Petitioner's ineffective assistance of counsel claim relies on evidence outside the record. Petitioner simultaneously sought an Evidentiary Hearing on a Sixth Amendment Claim under Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals* to supplement the record.

**A. Ms. Torres/Co-Conspirator Non-Hearsay**

Petitioner argued above the trial court erred by failing to limit the scope of the State's law enforcement witnesses' testimony regarding their interviews of non-testifying co-defendant/accomplice Ms. Torres. Trial counsel recognized this testimony as hearsay and challenged the State's argument that the testimony qualified as co-conspirator non-hearsay. (Tr. II 40-42). However, counsel provided no specific argument or cited any authority. When a basis for objecting exists and counsel fails to use available precedent to support an objection, if the error goes to the heart of the case, that failure cannot be considered strategy. *Collis v. State*, 1984 OK CR 80, ¶¶ 9-12, 685 P.2d 975, 977 (finding counsels failure to preserve error was ineffective).

**B. Detective Colby Earls' Opinion Testimony Regarding Petitioner's Guilt**

Petitioner argued that the trial court erred by allowing Detective Earls to testify, based on his training and experience as a law enforcement officer, that Petitioner's behaviors were inconsistent with those of an innocent man. Counsel's failure to object constituted ineffective assistance of counsel not only because it allowed the jury to consider improper and damaging evidence, but also because it failed to preserve the error for review. Turning first to performance, there is no way that the attorney's failure to object "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The OCCA's presumed finding to the contrary was unreasonable *See Stermer v. Warren*, 959 F.3d 704, 737 (6th Cir. 2020)

**C. Accomplice Instruction/Ryan Fields**

Petitioner argued the trial court erred by failing to instruct his jury that his testifying co-defendant Ryan Fields was an accomplice and provide the corresponding corroboration instruction. Ms. Fields was the State's only witness who provided an eyewitness account. Ms. Fields initially informed police Petitioner shot Mr. Holmes in self-defense after Mr. Holmes pulled a gun. However, after receiving a plea offer from the State, she changed her story and testified in Petitioner's trial that Mr. Holmes did not have a weapon and did not threaten Petitioner. Ms. Fields was the only witness the State presented to contradict Petitioner's self-defense story. The lack of instruction on this issue resulted in Petitioner's jury being completely unaware that it could not convict Petitioner on the self-serving testimony of Ms. Fields on this key point. This lack of legal guidance rendered the verdict unreliable. There can be no strategic reason for trial counsel's failure to request these

crucial required instructions. Any error deemed waived by counsel's failure to request the proper instruction is ineffective assistance of counsel resulting in prejudice. *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)

**D. Prosecutorial Misconduct**

Petitioner argued the State committed multiple instances of prosecutorial misconduct, including demeaning and disparaging Petitioner during cross-examination and closing arguments, presenting false and misleading testimony and argument, and using its closing arguments to invoke societal alarm. Unfortunately for Petitioner, while his trial counsel objected to some instances of misconduct, he failed to object to other obvious instances of misconduct. Petitioner maintains that the prosecutors' misconduct was egregious enough to deny him due process. However, he was equally prejudiced by his own advocate's failure to use the information provided to him by the State in discovery to prevent Detective Uptergrove from falsely testifying that Ms. Torres told him Petitioner confessed to robbing Petitioner. Trial counsel could have easily used the transcripts of Detective Uptergrove's recorded interviews with Ms. Torres to impeach Detective Uptergrove on this key point of the State's case. *See* 3.11 Application Attachment 1, Exhibits 1-3. It is clear from the record that trial counsel had copies of these interviews because he quoted from the transcripts during his cross-examination of Detective Uptergrove. (Tr. II 131-33).

**E. Biased Juror**

Petitioner argued that his convictions and sentences should be reversed because a biased juror sat on the jury who convicted him and sentenced him to the maximum sentence

of life without parole. It is clear from the State's voir dire and the pre-trial jury questionnaires that Juror S.M. and her husband had recently retired from the Altus Police Department after over 20 years of service. (Tr. I 86). In addition, when questioned by the State, Juror S.M. expressed reservations regarding whether she could set aside her law enforcement bias and tendency to favor the testimony of her fellow former colleagues in law enforcement who were slated as State's witnesses against Petitioner. (Tr. I 86-87). Trial counsel did not question S.M. about her prior service as an Altus police officer or any other topic, challenge S.M. for cause, or use a peremptory challenge to remove Juror S.M. As a result of counsel's ineffectiveness, Petitioner was convicted by a jury which included an obviously biased juror.

**G. Additional Evidence Supporting Theory of Defense**

Petitioner testified that he traveled to Ms. Torres's house to collect money Ms. Torres owed him and only shot Mr. Holmes in self-defense after Mr. Holmes pulled a gun on him. (Tr. V 135, 140-41). The State questioned Detective Uptergrove extensively regarding his interviews with Ms. Torres and more specifically why Ms. Torres said Petitioner was at her house on August 20, 2017. Detective Uptergrove testified that Ms. Torres told him that Petitioner was there to sell drugs to and/or rob Mr. Holmes. (Tr. II 121-23, 125). During cross-examination, trial counsel read from a portion of Detective Uptergrove's September 11, 2017, interview with Ms. Torres where Detective Uptergrove accused Ms. Torres of conspiring with Mr. Holmes to lure Petitioner to her home to rob him. (Tr.11131-33). Detective Uptergrove dismissed this line of questioning as "not what we ended up learning" and as "just a preliminary part of the investigation." (Tr. II 133).

Trial counsel used no other available information from the September 11, 2017, interview to support his theory that Ms. Torres and Mr. Holmes conspired to set Petitioner up. The jury never heard that the reason Detective Uptergrove even pursued this line of questioning with Ms. Torres was because when confronted with the fact Petitioner told police he came to her house to collect money she owed him, Ms. Torres admitted to owing Petitioner money. See 3.11 Application Attachment I, Exhibit 2, pages6-7, 21, 30-35. It is clear from the record that trial counsel believed this information was important to Petitioner's defense because he asked Detective Almanza if Ms. Torres ever told him she owed Petitioner money. Detective Almanza said no but admitted he had only spoke to Ms. Torres briefly on the morning of August 21,2017, and was not present for the August 25 or September 11, 2017, recorded interviews with Ms. Torres. (Tr. III 197).

Trial counsel failed to ask Detective Uptergrove or Detective Earls, the officers who actually conducted the recorded interviews, whether Ms. Torres informed them she owed Petitioner money. Had he done so, the jury would have known that Petitioner was telling the truth when he testified that Ms. Torres owed him money and supported his claim that he was in Altus on August 20, 2017, to collect the money Ms. Torres owed him and that Ms. Torres and Mr. Holmes set him up. (3.11 Application, Attachment 1, Exhibit 2, pages 6-7, 21, 30-35).

The Supreme Court has recognized defense counsel's knowledge regarding a certain legal theory or type of evidence triggers an obligation to look further. *Wiggins v. Smith*, 539 U.S.510, 534 (2003); *see also Paine v Massie*, 339 F.3d 1194, 1201-04 (10th Cir.2003)

This information would have clearly benefitted Petitioner's defense. Trial counsel's failure to utilize readily available evidence to support Petitioner's testimony was ineffective assistance of counsel. There is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 669. Counsel's deficient performance went directly to the foundation, affecting fundamental fairness and the very means by which the jury would have assessed the evidence presented by the State. The OCCA's resolution of this Petitioner's claims violate 28 U.S.C. § 2254(d) et seq.

## CONCLUSION

Wherefore, Petitioner respectfully moves this Court to Grant an conditional so Petitioner can be retried in a trial free of constitutional error. IT IS SO PRAYED!!!

Respectfully submitted,

/s/ DEBRA K. HAMPTON
DEBRA K. HAMPTON, OBA # 13621
Hampton Law Office, PLLC
3126 S. Blvd., # 304
Edmond, OK 73013
(405) 250-0966
(866) 251-4898 (fax)
hamptonlaw@cox.net
Attorney for Petitioner

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Office of the Attorney General, fhc.docket@oag.state.ok.us

I hereby certify that on December 14, 2022, I mailed a copy of the same to Petitioner who is not registered participants of the ECF System.

Marielle T. Smith, # 640152
DCF
6888 East 133rd Rd.
Holdenville, OK 74848

/s/ DEBRA K. HAMPTON
DEBRA K. HAMPTON

## VERIFICATION

I, **MARIELLE TREY SMITH**, # 640152, hereby declare under penalty of perjury that the foregoing Petition for Writ of Habeas Corpus is true and correct and verified by me and will be electronically filed by my attorney, Debra K. Hampton.

Executed on December 13, 2022.

MARIELLE TREY SMITH, # 640152
Davis Correctional Facility
6888 East 133rd Road
Holdenville, OK 74848-9033